**STATE of Maine**

**v.**

**Millard S. CHAPMAN.**

Supreme Judicial Court of Maine.

Jan. 2, 1969.

David Aldrich, County Atty., South Paris, Daniel G. Lilley, Asst. Atty. Gen., Augusta, for plaintiff.

McCarthy, Beliveau & Beliveau, by Albert J. Beliveau, Jr., William E. McCarthy, Rumford, for defendant.

Before WILLIAMSON, C. J., and WEBBER, TAPLEY, MARDEN, DUFRESNE and WEATHERBEE, JJ.

WEBBER, Justice.

Pursuant to M.R.Crim.P., Rule 37A(b) and 15 M.R.S.A., Sec. 2115-A there is reported for our determination an interlocutory order suppressing evidence prior to trial, from which order the State has appealed.

The following issues are framed for decision here:

"1. Whether or not the items taken by law enforcement officials were abandoned property at law and, therefore, not under the protection of the Fourth Amendment to the United States Constitution.

2. Whether or not the search and seizure was unreasonable under the Fourth Amendment to the United States Constitution on the particular facts of this case.

(a) Whether failure of law enforcement officials to obtain a search warrant while processing a murder scene is violative of the Fourth Amendment of the United States Constitution?

(b) Whether the law enforcement officials could have satisfied requirements of the specificity clause of the Fourth Amendment to the United States Constitution had they tried to obtain a search warrant?"

 The motion to suppress, as amended, concerned an empty whiskey bottle with coagulated blood and hair adhering to the bottom; also a pair of women's shoes. Whether or not a search without warrant is reasonable depends upon the facts of each case. In the instant case the facts are not in dispute.

On November 11, 1967 at about 2:00 A.M. Fred Fortier, a South Paris police officer, responding to a radio call from the office of the Sheriff of Oxford County, went to the home of the defendant. In answer to his knock, the defendant opened the door and said, "Good morning, Fred. Come on in." The defendant and the officer were well acquainted. The defendant then walked into his living room and sat down, saying, "I guess she is gone, Fred." The officer then observed Mrs. Chapman "slumped over in a chair" in that portion of the room used as a "dinette." There was blood over her face, hands and clothing. The officer picked up Mrs. Chapman's left arm and found it cold and stiff. He then went to the telephone and called Deputy Arsenault, desk officer in the Sheriff's office. In about fifteen minutes Dr. Dixon, the medical examiner, arrived. During this interval the defendant spontaneously volunteered the information that "she fell down" and that "she hemorrhaged." He did not state where, how or why she "fell" and was not questioned. At about 2:35 A.M. the County Attorney, the Sheriff and one or more deputy sheriffs arrived. The County Attorney, who had also known the defendant for several years, exchanged greetings with him and then asked, "Do you mind if we look around a little bit?"—to which the defendant responded, "No, not at all. Go right ahead." The officials observed the body of Mrs. Chapman and the presence of quantities of blood in the hallway, both bedrooms, the living room and kitchen. They observed a pair of women's shoes on the living room floor and a pair of trousers in the corner of the bedroom. A photographer arrived and took some interior pictures for the State. At about 3:00 A.M. the defendant was taken into custody and transported by the Sheriff to his office. No formal charge was lodged against him at that time. The other officials continued their investigation of the premises. Lieutenant Jordan of the Maine State Police, a criminal investigator and photographer was called at his home in Augusta

by an officer at State Police headquarters at about 3:00 A.M. At about the same time Detective Greely, also of the Maine State Police, was called at his home in Freeport. Both officers departed promptly for South Paris and arrived at the Chapman home at about 4:30 A.M. where they were admitted by Officer Fortier, then in sole charge of the premises. In the interim at an unstated time the body of the decedent had been removed to a hospital in Rumford for post mortem examination. Jordan and Greely made only a cursory examination of the premises, remaining 20 to 25 minutes. After a brief stop at the Sheriff's office they departed for the Rumford hospital. At about 5:00 A.M. Officer Fortier was relieved by Deputy Sheriff Chamberlain who continued to maintain police access to and control over the premises. The County Attorney and the Sheriff also traveled to Rumford to observe the autopsy. Dr. Haladjien, a pathologist, began the autopsy about 9:00 A.M. Lieutenant Jordan took photographs during the course of the examination. The doctor found a deep laceration at the bridge of the nose and a fracture in that area. He found multiple bruises about the face and in the region of the left eye. He was able to determine that the decedent had died lying on her back and that the cause of death was hemorrhagic shock. He concluded that she had suffered a severe trauma at the bridge of the nose which could have been caused by a blunt or a sharp instrument, a fist or even by a fall upon a sharp object or upon the floor. After the completion of the autopsy, the officials stopped briefly for coffee and then returned to South Paris. All four returned to the Chapman home where they were admitted by Deputy Sheriff Chamberlain. They arrived at about noon. They then began a more thorough investigation of the premises. On his first visit Lieutenant Jordan had observed the trousers, above referred to, in the bedroom and had discovered that they contained fecal matter. On his second visit his attention was called to a spot on the inside of the door frame

leading to the cellar which appeared to be blood. This officer then proceeded through this door and down the cellar stairs. Here he found a trace of what appeared to be fecal matter on the door frame leading to the basement garage. He then entered the garage. There he observed three trash cans with covers. In the center can, after removing part of the paper, cans and trash which it contained, he found an empty "Four Roses" whiskey bottle upside down. Noting that the bottle showed evidences of coagulated blood and hair on its bottom, he first caused it to be photographed in its then position, after which he removed it and placed it in the possession of Detective Greely at 12:45 P.M. It was subsequently locked in the evidence closet at State Police headquarters in Augusta. Either on that occasion or on a subsequent visit two days later Lieutenant Greely removed the pair of shoes which were on the living room floor. The defendant was subsequently charged with murder. No search warrant was ever sought for or obtained by the police.

On Monday, November 13, 1967 Lieut. Greely returned to the premises by arrangement made by the County Attorney and the defendant's attorney for the purpose of making measurements and diagrams of the rooms. As already noted, it may have been either on this occasion or on November 11th that he took possession of the shoes.

Two controlling facts emerge in this recitation. The first entry of Officer Fortier was a lawful entry by the express consent and invitation of the defendant. From that time until about 12:45 P.M. on November 11, 1967 when the police investigation of the premises was terminated, the police never abandoned their possession and control of the premises.

■ At the outset we can briefly dispose of the matter of the shoes removed by Lieut. Greely. Given the lawfulness of the original entry, we need only consider that

the shoes were plainly visible on the living room floor. Their discovery was not the product of a search. As material evidence they were properly subject to removal by the State. It matters not, therefore, whether they were removed on November 11, 1967 during the investigation or on November 13, 1967 when Lieut. Greely was again on the premises by consent of the defendant given by his attorney. "It has long been settled that objects falling in the plain view of an officer who has a right to be in the position to have that view are subject to seizure and may be introduced in evidence." Harris v. United States (1968) 390 U.S. 234, 88 S.Ct. 992, 993, 19 L.Ed.2d 1067.

The discovery of the bottle, however, was the product of a search and the issue is then whether or not that search was reasonable under all of the existing circumstances. The test was stated in United States v. Rabinowitz (1950) 339 U.S. 56, 70 S.Ct. 430, 435, 94 L.Ed. 653 wherein the Court said: "The mandate of the Fourth Amendment is that the people shall be secure against *unreasonable* searches. * * The relevant test is not whether it is reasonable to procure a search warrant, but whether the search was reasonable. That criterion in turn depends upon the facts and circumstances—the total atmosphere of the case."

Our own research and that of learned counsel for both the State and the defendant have revealed the paucity of opinion with respect to the right of police officials to conduct an investigation on the premises where an apparently violent death has occurred and a homicide or other serious crime may have been committed, and to which premises the police have gained lawful entry without warrant.

In Stevens v. State (Alaska 1968) 443 P. 2d 600, 602, 603 the police were called to the defendant's home in which decedent had been shot and killed. The local Chief of Police first responding to the call in the early morning hours was admitted by defendant's wife. The Court posited the lawfulness of his entry, not upon consent, but upon the reasonable belief of the officer that an emergency existed. The officer next arrested the defendant "to prevent him from taking his own life, as he was threatening to do," and left the premises to place the defendant in custody. He then returned with the Mayor. After a superficial inspection the officer locked the house with a padlock. At 3:00 A.M. the Mayor called the Alaska State Police. About ten hours after the first entry, officers from the State Police Department and the District Attorney arrived and were admitted by the local officer. They then made a complete investigation and removed many evidentiary items, most but not all of which were in plain view.

We are primarily concerned with the Alaska Court's views with respect to the right and duty of police to make a thorough investigation, particularly in a homicide case, or, to use the phrase commonly employed, to "process the scene." The Stevens Court made these pertinent observations. "After his legal entry, and upon learning that a homicide had been committed, it became Chief Knudson's *duty to conduct an investigation into the circumstances. This duty carried with it the right to inspect the premises.* * * * The duty police officer who responds to an emergency call and discovers a homicide is not necessarily a competent officer to conduct *the type of investigation necessary to protect the interests of society.* This is particularly the case with respect to a small frontier village such as Hoonah. In a more populous area the officer discovering a homicide could remain at the scene until trained investigators arrived to conduct an investigation. *In that situation the presence of the officer making the legal entry would continue until summoned investigators arrived.* Only minutes or possibly no more than an hour or two would ordinarily elapse between the legal entry and the commencement of the police investigation of the homicide. The lapse

of time between the legal entry and the commencement of the investigation in the usual case has not been held to be so unreasonable as to affect the legality of the presence of the investigating officers on the premises." (Emphasis ours)

■ We realize, of course, that Stevens was dealing with the legality of the investigatory presence on the scene and not primarily with search and seizure during that investigation, but we find persuasive the Court's views as to the right and obligation of the police to make a thorough investigation of premises on which a violent death has occurred, even to the extent of securing the aid of trained and experienced investigators. We note especially the view expressed that the police, by keeping control of the death scene, do not lose the benefit of their initial lawful entry.

It has been held that a search once lawfully begun may be interrupted and later continued if the "totality of circumstances" under such continued search is reasonable. People v. Williams (1967) 67 Cal.2d 226, 60 Cal.Rptr. 472, 474, 430 P.2d 30, 32. The Court deemed it significant that "defendant's automobile was under constant police surveillance during the interval of postponement, and the delay was not of unreasonable duration." The Court cited its prior decision in People v. Webb (1967) 66 Cal.2d 107, 56 Cal.Rptr. 902, 424 P.2d 342, 351 which relied upon the theory of a continuing series of events. Webb in turn relied in part on Price v. United States (1965) 121 U.S.App.D.C. 62, 348 F.2d 68, 70 (cert. den. 382 U.S. 888, 86 S.Ct. 170, 15 L.Ed.2d 125) in which it was stated, "The search * * * was part of a *continuing series of events* which included the original arrest and continued uninterruptedly *as lawful police investigation and action.*" (Emphasis ours)

In the recent case of Terry v. State of Ohio (1968) 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889, the Supreme Court had occasion to deal for the first time with search and seizure without warrant and where there was, at least at the outset, *no probable cause for arrest* ("stop and frisk"). Because the opinion seems to us to rest in part on a concept of proper and carefully restricted police investigatory and protective procedures, and because it sets forth certain general guidelines for constitutionally permissible behavior, we quote excerpts from it at length commencing at page 1875:

"The exclusionary rule (excluding from evidence the fruits of unlawful searches and · seizures) has its limitations, however as a tool of judicial control. It cannot properly be invoked to exclude *the products of legitimate police investigative techniques* on the ground that much conduct which is closely similar involves unwarranted intrusions. upon constitutional protections. * * *

Yet a rigid and unthinking application of the exclusionary rule, in futile protest against practices which it can never be used effectively to control, may exact a high toll in human injury and frustration of efforts to prevent crime. * * * Nothing we say today is to be taken as indicating approval of police conduct *outside the legitimate investigative sphere.* Under our decision, courts still retain their traditional responsibility to guard against police conduct which is overbearing or harassing, or which trenches upon personal security without the objective evidentiary justification which the Constitution requires. When such conduct is identified, it must be condemned by the judiciary and its fruits ·must be excluded from evidence in criminal trials. And, of course, our approval of *legitimate and restrained investigative conduct undertaken on the basis of ample factual justification* should in no way discourage the employment of other remedies than the exclusionary rule to curtail abuses for which that sanction may prove inappropriate. * * *

We do not retreat from our holdings that the police must, whenever practicable, obtain advance judicial approval of searches and seizures through the warrant procedure, * * * or that in most instances failure to comply with the warrant requirement *can only be excused by exigent circumstances,* * * *. But we deal here with an entire rubric of police conduct—necessarily swift action predicated upon the on-the-spot observations of the officer on the beat—which historically has not been, and as a practical matter could not be, subjected to the warrant procedure. Instead, the conduct involved in this case must be tested by the Fourth Amendment's general proscription *against unreasonable searches and seizures.* * *

In order to assess the reasonableness of [the officer's] conduct as a general proposition, it is necessary 'first to focus upon the *governmental interest* which allegedly justifies *official intrusion* upon the constitutionally protected interests of the private citizen,' for there is 'no ready test for determining reasonableness *other than by balancing the need to search [or seize] against the invasion which the search [or seizure] entails.'* * * * And in justifying the particular intrusion the police officer *must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.* The scheme of the Fourth Amendment becomes meaningful only when it is assured that at some point the conduct of those charged with enforcing the laws can be subjected to the more detached, neutral scrutiny of a judge who must evaluate the reasonableness of a particular search or seizure in light of the particular circumstances. And in making that assessment it is imperative that the facts be judged against an objective standard: *would the facts available to the officer at the moment of the seizure or the search 'warrant a man of reasonable caution in the belief' that the action taken was appropriate?* * * * Anything less would invite intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches, a result this Court has consistently refused to sanction. * * *

Applying these principles to this case, we consider first *the nature and extent of the governmental interests involved.* One general interest is of course that of *effective crime prevention and detection*; it is this interest which underlies the recognition that a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior *even though there is no probable cause to make an arrest.* * * * It would have been poor police work indeed for an officer of 30 years' experience in the detection of thievery from stores in this same neighborhood *to have failed to investigate this behavior further.* * * *

And in determining whether the officer acted reasonably in such circumstances, due weight must be given, not to his inchoate and unparticularized suspicion or 'hunch,' but to *the specific reasonable inferences which he is entitled to draw from the facts in light of his experience.* * * *

The manner in which the seizure and search were conducted is, of course, as vital a part of the inquiry as whether they were warranted at all. The Fourth Amendment proceeds as much by limitations upon the scope of governmental action as by imposing preconditions upon its initiation. * * * Thus, evidence may not be introduced if it was discovered by means of a seizure and search which were not *reasonably related in scope* to the justification for their initiation." (Emphasis ours)

In Camara v. Municipal Court, (1967) 387 U.S. 523, 87 S.Ct. 1727, 1733, 1735, although the Court was dealing with war-

rantless administrative searches (fire, health and housing code inspection programs), some language in the opinion is of general application. The Court said, "In assessing whether the *public interest* demands creation of a general exception to the Fourth Amendment's warrant requirement, the question is not whether the public interest justifies the type of search in question, but whether the authority to search should be evidenced by a warrant, which in turn depends in part upon *whether the burden of obtaining a warrant is likely to frustrate the governmental purpose behind the search.* * * * Unfortunately, there can be no ready test for determining reasonableness other than by balancing *the need to search against the invasion which the search entails."* (Emphasis ours)

■ With these several guidelines in mind, we turn to an analysis of the facts to determine whether or not the "totality of circumstances" rendered reasonable and therefore constitutionally lawful the warrantless search and seizure in this case. We begin with the consensual entry of Officer Fortier upon the premises which the defendant readily concedes was lawful. Once there, he was faced at once with an emergency. Mrs. Chapman was dead. The severe wound upon her body and the presence of quantities of blood, not only in the vicinity of the body, but in several rooms, were strongly suggestive of the possibility of violent death or homicide. At that moment the duty and obligation of the police arose to make a thorough investigation to determine whether the decedent was the victim of foul play and if so by whom and by what means. Officer Fortier initiated proper police investigative procedures by telephoning for assistance. In response to his call those officials directly charged with the investigation of a potential homicide case gathered at the scene. The circumstances there present created a difficult and somewhat unusual problem for solution by further investigation. The police could not immediately rule out the possibility that death had resulted from a fall as voluntarily and spontaneously represented to them by the defendant. Such a fall could have occurred as the result of a cerebral accident, an acute heart failure or other seizure, or even as the result of the consumption of alcohol. Or it could have occurred as the result of a tragic accident. There were indications, however, pointing with equal if not greater persuasiveness toward the application of violent force by some assailant as the cause of death. The logical next step in the investigation was to secure and observe an autopsy which might eliminate (as it did) at least some of the alternative possibilities. Recognizing that the investigation of the scene was by no means completed, the police carefully maintained their exclusive control of the premises, thus insuring the exclusion of unauthorized persons and the protection and preservation of any evidence thereon. Thus when the examination of the premises was resumed, it was but the continuation of a single investigation, a "continuing series of events," commenced with a lawful entry and pursued because of the exigency of circumstances. Although the police had from the beginning a reasonable basis for suspecting that a weapon had been used, the actual cause of death and the element of criminal conduct could not be known or rise above the level of a rational possibility until the weapon was actually found at the termination of the investigation.

There is no more serious offense than unlawful homicide. The interest of society in securing a determination as to whether or not a human life has been taken, and if so by whom and by what method, is great indeed and may in appropriate circumstances rise above the interest of an individual in being protected from governmental intrusion upon his privacy. In our view this is such a case. We see here no more than the "legitimate and restrained investigative conduct undertaken on the basis of ample factual justification" which is not proscribed by the Fourth Amendment. Terry v. State of Ohio, supra.

The public had a right to expect and demand that the police would conduct a prompt and diligent investigation of these premises to ascertain the cause of this apparently violent death and to solve any crime committed in the course thereof.

■ It has been suggested that the police could and should have obtained a search warrant before those officers who attended the autopsy returned to the scene. We cannot agree. No warrant was required to gain entry since the police were still in sole possession and control of the premises. As to obtaining a warrant to search and seize, no officer could have supplied the requisite factual affidavit. The pathologist had been able to do no more than rule out natural causes of death. He had not ruled out accidental fall as an alternative possibility. Although the officers reasonably entertained a lively suspicion or "hunch" that death had been caused by an assailant, they could not recite facts which would support a finding of probable cause to believe a crime had been committed. Moreover, it was impossible to describe with any specificity whatever the weapon to be searched for or to assert that there was any reason to believe that such unidentifiable weapon could be found upon the premises. Innumerable objects great and small would answer the description of a "blunt or sharp instrument." For aught that was known at this moment, an assailant might have pushed his victim violently against a desk, a bed, table or chair—or he might have struck her with his fist. All of these theories remained as reasonable subjects for speculation and conjecture up to the very moment when the bottle was found. There was the hope, but no more than a hope, that an instrument might be found bearing some traces of blood or tissue, but a mere hope unsupported by facts will scarcely furnish probable cause to believe such an object can and will be found on the premises.

■ Delay in searching for a magistrate on a legal holiday might well have been costly. There was good reason for urgency in proceeding with the investigation. Even though police protection of the premises prevented the possibility of removal of incriminating evidence therefrom, there was still the very real possibility that if a weapon had in fact been used, it had been concealed by the assailant outside and apart from the premises before the arrival of the first officer. In such a location the evidence would be in danger of being lost or destroyed. The very facts of this case dramatically illustrate the risks attendant upon delay in proceeding with and completing the investigation. For if it had been abandoned or deferred, in the normal course of events the trash barrels would have been picked up by the collector engaged by the defendant for that purpose, and the incriminating evidence would have been removed and destroyed without the knowledge of anyone that it even existed. Without doubt the crime, if such it was, would have then become and remained insoluble. The impracticability, and in this case the impossibility, of procuring a search warrant on the basis of the facts actually known and not merely surmised are factors in assessing the reasonableness of the warrantless search. In the words of *Camara,* the burden of obtaining a warrant in such a case as this would be not only likely but well nigh certain to "frustrate the governmental purpose behind the search."

■ *Terry* teaches also that reasonable search and seizure must not involve improper police harassment and must be "reasonably related in scope to the justification for their initiation." Although we rest the reasonableness of this search upon the exigency of the circumstances rather than upon any consent of the defendant to a search, we think the outward manifestations of consent on the part of the defendant do at least have the effect of negativing any claim of harassment. Moreover, the scope of this search was clearly within permissible limits and warranted by visible indications on the scene pointing toward homicide as one rational explanation of death.

The State has argued that deposit of the bottle in a trash barrel constituted abandonment. We do not accept that argument. The barrel was still in the garage under the main house, a part of the premises in which the owner dwelt. The position of the bottle well down in the barrel and covered with trash and paper strongly suggests that it was intentionally hidden and concealed there. This was the view taken in Work v. United States (1957) 100 U.S.App. D.C. 237, 243 F.2d 660, 663. We distinguish Abel v. United States (1960) 362 U.S. 217, 80 S.Ct. 683, 698, 4 L.Ed.2d 668 in which the defendant abandoned his hotel room and the wastebasket therein in which he deposited evidentiary items just before his final departure.

The defendant relies in part on State v. Brochu (Me.1967) 237 A.2d 418. In that case there were two entries, the first by consent of the defendant and the second on the following day under the protection of a search warrant. In the interim and between the two searches the defendant Brochu was arrested and taken into custody. The State argued alternatively that the consent of the defendant, never revoked, justified the second entry and search, but that in any event the second search was protected by warrant. We repudiated the first contention on the ground that a consent to the first entry and search could not be deemed to continue after defendant's arrest. Brochu is distinguishable upon its facts. After the first entry and search the investigation of the premises terminated and the police left with no intention to return. Thereafter the premises were in the custody and possession, not of the police, but of occupants who were related to the defendant. The need to make another entry and search arose only because the police obtained new information from a daughter of the defendant. There was not the single uninterrupted investigation or continuous series of events which we find in the instant case, nor was there the exigency of circumstances arising out of conditions apparent at the scene at the moment of first inspection which would make reasonable a

search without probable cause for arrest and without warrant. Moreover, in Brochu it was both possible and practicable to procure a warrant for the second search, which as we have noted is not true in the instant case.

We are satisfied that if the police cannot, after lawful entry, make the sort of prompt, orderly and methodical investigation of the scene of a violent death that is here shown, the protection of the legitimate interests of society will be seriously weakened. The bottle and shoes, if otherwise admissible, should not be excluded from the evidence on constitutional grounds.

The entry will be

Appeal sustained. Case remanded to the Superior Court for further proceedings not inconsistent with this opinion.

DUFRESNE, Justice (dissenting).

The sole issue for determination is whether or not the suppression of an empty whiskey bottle with what appeared to be blood and hair adhering to the bottom thereof and a pair of shoes as the fruits of an unlawful search and seizure was error on the part of the Justice below. His decision in pertinent parts reads as follows:

"It may be that the search of the scene under these circumstances is not unreasonable and that these officers were protected by their authority to 'process the scene'. However, since the existence of such authority is postulated on the grounds of necessity it would appear that its scope, both spacially and temporally, must be limited by that same necessity. Whether or not such an exception to the traditional limitations on search without a warrant can be substantiated, it seems that once the body of the victim has been removed from the premises and the premises have been secured against intrusion and is under guard by a police officer, there no longer exists any necessity which would justify a re-entry into the

premises without the authority of judicial process.

Clearly, in the interim between 5:00 A.M. and 12:00 M the officers in this case had ample opportunity to apply for and obtain a search warrant. In its argument, the State suggests that this is not the case because of its inability to adequately describe the instrument for which the search was to be conducted. In the Court's view, a warrant issued to these officers providing for a search of the defendant's premises for any instrument capable of being wielded as a weapon and containing stains of human blood, and/or hair, and/or tissue, would have provided adequate protection against any so-called fishing expedition and would have authorized a search for that for which Lt. Jordan testified he was looking.

Unfortunately, the officers involved in this case, with the very best of intentions, have done exactly that which the Fourth Amendment to the United States constitution forbids them to do. Their return to the defendant's premises and search thereof being in violation of his constitutional rights, the fruits of their unlawful search must be and are ordered suppressed."

I agree fully with the decision of the Superior Court and hereby respectfully record my dissent to the opinion of my Brethren in the instant case. Initially, however, may I say that I need consider only the Fourth Amendment of the Constitution of the United States enforceable against the several States through the Fourteenth Amendment. Mapp v. Ohio, 81 S.Ct. 1684, 367 U.S. 643, 6 L.Ed.2d 1081; Collins v. Klinger, 1964, 9th Cir., 332 F.2d 54. Indeed, like principles apply under our own State Constitution. Article I, Section 5. State v. Brochu, 1967, Me., 237 A.2d 418, 421. Since *Mapp,* the interrelationship of the fourth amendment and the due process clause of the fourteenth amendment operate as a constitutional mandate upon the state courts to guarantee to individuals their right of privacy against unreasonable state intrusion by rendering evidence obtained by unreasonable search and seizure inadmissible in a state prosecution based thereon. Ellison v. State, 1963, Alaska, 383 P.2d 716. The standard of reasonableness is the same. Ker v. California, 374 U.S. 23, 83 S.Ct. 1623, 10 L.Ed.2d 726.

It is true that under certain circumstances the practical demands of effective criminal investigation and law enforcement when viewed in realistic measurements of public interest, police obligation and self-protective action, may justify precautionary weapon checks or immediate searches, if the right of society to ferret out crime is not to be frustrated by the necessary delay attendant upon compliance with the constitutional strictures of the fourth amendment. People v. Cove, 1964, 228 Cal.App.2d 466, 39 Cal.Rptr. 535.

But the salutary and overriding constitutional objective that the police obtain search warrants as a routine practice in all except truly exigent circumstances should never be thwarted on mere pretense or for technical difficulties.

In the words of Miller v. United States, 1958, 357 U.S. 301, 313, 78 S.Ct. 1190, 1197, 1198, 2 L.Ed.2d 1332.

"We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness."

"We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a

showing by those who seek exemption from the constitutional mandate that *the exigencies of the situation made that course imperative."* [Emphasis supplied]. McDonald v. United States, 1948, 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153.

Constitutional alertness to possible police invasion of privacy will demand stricter compliance of police conduct to constitutional requirements where the area to be searched is one's dwelling house rather than an automobile or pedestrian on the street or boat on the water.

"[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought." Carroll v. United States, 1924, 267 U.S. 132, 45 S.Ct. 280, 285, 287, 69 L.Ed. 543. See also, State v. Hall, 1966, Iowa, 143 N.W.2d 318.

The guaranties of the fourth amendment must be accorded to the guilty as well as to the innocent without discrimination. Miller v. United States, supra; McDonald v. United States, supra. In cases of infamous crimes such as murder, the individual person suspected by the police to have committed the felony has a definitely greater need for the application of the constitutional safeguards than he would otherwise have when involved in the commission of lesser crimes. Incipient dilutions of the constitutional formula will soon render meaningless the constitutional police restraints formulated by our forefathers. Such will be the inevitable result

if we should adopt as the polestar of construction of the fourth amendment the present clamor of public necessity to ferret out crime.

Courts should approach the fourth amendment with a liberal touch in favor of the citizen so as to prevent any stealthy encroachment upon or gradual depreciation of the rights secured through imperceptible practice of courts or by repetitive conduct of well-intentioned but mistakenly over-zealous executive officers. Gouled v. United States, 1921, 255 U.S. 298, 41 S.Ct. 261, 65 L.Ed. 647; People v. Kaigler, 1962, 368 Mich. 281, 118 N.W.2d 406.

The burden of pleading and proving exceptional circumstances which would authorize a search without a search warrant and *not incident to a valid arrest* should be upon those who conducted the search, as a matter of defense. They are in a better position than is the person searched, to know whether exceptional circumstances were relied upon as providing authority for the search, and, if so, what those circumstances may have been. It is therefore fitting that the State carry the affirmative burden as to this, and that an accused not be required to plead and prove the negative of the proposition. See, Cohen v. Norris, 1962, 9th Cir., 300 F.2d 24, at 32; McDonald v. United States, 1948, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153; United States v. Jeffers, 1951, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed.2d 59; Ellison v. State, 1963, Alaska, supra; Hernandez v. United States, 1965, 9th Cir., 353 F.2d 624.

In the instant case, the initial entry to the Chapman home by Police Officer Fortier was lawful. Whether the accused gave such voluntary and knowledgeable consent to the entry as to legally waive any constitutional privilege connected with the same or whether his consent was in submission to lawful authority and tantamount to no consent, need not be decided. With or without consent, the officer's entry without a warrant was proper under the existing emergency situation. Officer Fortier testified to a radio call from the Sheriff's

office to check on what was going on at the Chapman home and as he walked up to the house he could see Mrs. Chapman sitting in a chair next to a reading lamp. She was slumped over and there was blood over her face. Basic human principles required that Officer Fortier under the circumstances as appeared to him at the time hastened to the house not only to investigate the report but hurried his entry therein to offer aid to Mrs. Chapman on the very distinct possibility that her life depended on emergency medical attention. When the attending circumstances indicate to the officer as a reasonable and prudent person that any delay attendant upon securing a search warrant might mean the difference between life and death for the person within the home, the constitutional requirement of the fourth amendment must give way to the paramount duty of the officer to preserve a human life. Davis v. State, 1964, 236 Md. 389, 204 A.2d 76. The right of the police to enter and investigate in an emergency without the accompanying intent to either search or arrest is inherent in the very nature of their duties as peace officers and derives from the common law. Had Officer Fortier been denied entry to the Chapman home, it would have been his right and duty to gain entry forcibly without delay. United States v. Barone, 1964, 2nd Cir., 330 F.2d 543, cert. den. 84 S.Ct. 1940, 377 U.S. 1004, 12 L.Ed.2d 1053.

When Officer Fortier ascertained as a fact that Mrs. Chapman was dead, the emergency ceased but his presence upon the premises continued lawful, if not to investigate the death of a person due from all appearances to violence, at least to comply with the specific mandate of the statute that the scene of the violent death be processed. Indeed, 22 M.R.S.A. § 512 requires under such circumstances that

"Such official [police officer] shall immediately take charge of such body and retain custody thereof without moving the same, except as otherwise provided, until the arrival of a medical ex-aminer, the county attorney, the sheriff or a member of the State Police. The official taking charge of said body shall immediately notify the county attorney or sheriff, who shall in turn arrange for the attendance of the most readily accessible medical examiner.

\*    \*    \*    \*    \*    \*

If no such danger exists, the body shall not be moved until the arrival of the medical examiner, the sheriff, a member of the State Police or the county attorney, *and* until photographs have been taken or measurements and drawings have been made to record the physical facts relative to the location and position of the body, under the supervision of the county attorney, the State Police or sheriff, or unless the Attorney General or the county attorney waives such requirements. After such photographs or such measurements and drawings have been made or have been waived *and* after the medical examiner has completed such examination as required of him in section 514, the body may be removed to a convenient place.

\*    \*    \*    \*    \*    \*

If and when it shall appear to the county attorney that the case is one of probable homicide, he shall notify the Attorney General of the fact." [Emphasis supplied]

Officer Fortier carried out his statutory duties and within the hour the medical examiner was at the Chapman building as well as the County Attorney and the Sheriff of the County of Oxford. Again, whether the County Attorney's entry was made with valid constitutional consent or in obedience to lawful authority on the part of the accused stands immaterial, as it was the statutory duty of the County Attorney to make his entry into the house, forcibly, if necessary, to attend to the obligations cast upon him in such cases of violent deaths. The Sheriff's entry was similarly lawful under the terms of the statute and also as the chief executive officer of the

state in his county, responsible by the common law and statute law as the conservator of the peace and the protector of society against the commission of vice and crime. Sawyer v. Androscoggin County Commissioners, 1917, 116 Me. 408, 411, 102 A. 226.

The scene had been completely processed as required by the statute no later than 4:30 A.M. since the body of Mrs. Chapman had been removed prior to the first visit of the State troopers to the Chapman residence. But in the initial stages of the investigation of the scene, the County Attorney and the Sheriff had concluded from an inspection of the corpse and a survey of the area surrounding the deceased, and most probably from conversation with the medical examiner, that Mrs. Chapman had been the victim of felonious foul play and that the accused was the guilty party. Mr. Chapman was arrested at about 3:00 A.M., or shortly thereafter, less than an hour after both county officials had acquainted themselves fully with all the surrounding circumstances. True, as the County Attorney testified, the specific charge had not been determined at the time of arrest, but in his words, after having seen the condition of the deceased, it was apparent that a charge of some sort would probably be lodged against the accused. May I suggest that the official dilemma at that point was whether the accusation should be murder or manslaughter.

Probable cause exists where the facts and the circumstances within the officer's knowledge are sufficient in themselves to warrant a man of reasonable caution in the belief that a crime has been or is being committed. Carroll v. United States, 1925, 267 U.S. 132, 161, 45 S.Ct. 280, 288, 69 L.Ed. 543, 552, 39 A.L.R. 790; Henry v. United States, 1959, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134. And the accused's self-serving statement that his wife fell and hemorrhaged would not be inconsistent with the existence of probable cause that he had committed the crime of murder or manslaughter, since the circum-stances need not exclude every other hypothesis than that of guilt but are sufficient if they generate reasonable ground for belief of guilt. State v. Littlefield et al., 1965, 161 Me. 415, 419, 213 A.2d 431; State v. Warner, 1967, Me., 237 A.2d 150, 169.

The County Attorney's testimony in the court below clearly demonstrated reasonable grounds of suspicion that a felony had been committed and that the arrested person, Mr. Chapman, was guilty of the felony, and thus justified the arrest by the Sheriff. State v. Estabrook, 1968, Me., 241 A.2d 880; Therriault v. Breton, 1915, 114 Me. 137, 95 A. 699.

On redirect examination by the State:

"Q Now, another point that you brought out on your cross-examination or was brought out on cross-examination your reasons for arresting Mr. Chapman or discussing the procedure of arrest with Sheriff Haskell, you stated, I believe, was your observations of the wounds of Mrs. Chapman seated in the chair. That was the primary reason, is that what you have testified to?

A That is correct.

Q So at that time your observations of the nature of the wounds of the deceased led you to believe that Mr. Chapman would be a suspect, is that right?

A That is correct.

Q Or that he might be arrested shortly thereafter? How did you arrive at that conclusion, because of the nature of the wounds?

A Well, during the 45 minutes I was present with the medical examiner, there were large amounts of blood in the master bedroom, in the hallway, puddles of blood which had soaked into a braided rug in the hallway, blood in the livingroom, in the kitchen, on the sink, in the bedroom, the wounds on her nose, the condition of her eyes.

Q  Without continuing further, did you have at that time an idea of whether or not an instrument might have caused that wound?

A  At that time it was apparent that some instrument had to have caused that wound.

Q  So then I take it the result of the autopsy returns merely confirmed your later observations?

A  That is correct, that this death was not a result of natural causes."

On recross examination:

"Q  When Mr. Chapman was taken from the premises, there wasn't any doubt that he was arrested then and there and he was going to be charged a little later; there wasn't any doubt about that, was there?

A  No, I wouldn't say there was.

Q  But at the same time, as you were looking around the premises you weren't necessarily looking for this, say, bottle of whiskey or an instrument of that nature, were you?

A  Well, in a way we were."

A reasonable search without a warrant may be made incidental to a valid arrest. United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653. Abel v. United States, 362 U.S. 217, 80 S.Ct. 683, 4 L.Ed.2d 668. From 3:00 A.M. to about 4:30 A.M. a thorough search of the whole premises was conducted by the County Attorney and members of the Sheriff's department following Mr. Chapman's arrest, and it included in its exploration not only the cellar area as was testified to, but also the garage where the waste barrels containing the suppressed bottle were located. The evidence fully supports the inference that the garage doors were closed during the initial search and the presiding Justice must have made this factual deduction and considered it as one of the factors in viewing this search incidental to arrest as complete and ended with the departure of the County Attorney and deputy sheriffs from the premises, notwithstanding the securing of the premises through the posting of an officer at the door. When the two State troopers arrived at the Chapman residence for the first time, their entry therein without warrant cannot sustain constitutional scrutiny.

There was not an iota of concrete evidence before the Justice below that the search was being postponed by the Sheriff or the County Attorney at the time they discontinued it, either on the grounds that the autopsy results were necessary and would be awaited or for any other cause whatsoever. The record is silent thereon. When the 2 State troopers visited the Chapman home, they did so on their own initiative. Nothing in the record discloses that they were directed to do so by the Sheriff who had taken charge of the proceedings from the start. Although the "members of the State Police are vested with the same powers and duties throughout the several counties of the State as sheriffs have in their respective counties * * * to investigate and prosecute violators of any law of this State and to arrest the offenders thereof," the Legislature never intended that the Sheriff's duties in all criminal cases including homicides be merely a holding action pending the arrival of the State Police, but rather that the law enforcement agency first on the scene proceed with its duties as was done in the instant case, while the other stood in the ready position with cooperative action. The statute says:

"The State Police, sheriffs and deputy sheriffs, constables, city marshals, deputy marshals and police officers of cities and towns shall, so far as possible, cooperate in the detection of crime, the arrest and prosecution of criminals and the preservation of law and order throughout the State." 25 M.R.S.A. § 1502.

Thus, the record does not support justifiable state police entry on their initial visit to the Chapman home without search warrant after the statutory processing of the homicide scene had been completed and

discontinued and after the search of the premises incident to Mr. Chapman's arrest had ceased.

The fact that the Sheriff kept custody of the Chapman home by posting initially a town policeman and then a deputy sheriff on the outside to control access to the premises may display a technical device of continuity of official impoundment of the scene of the crime, but has never been recognized as sufficient to arrest the overriding dictates of the Constitution. The initial entry by the law enforcement officials was legal. It continued so during the statutory processing of the scene. Their right to search without warrant as an incident to arrest merged with their right to process the scene and endured beyond its completion. Once the Sheriff's task was completed however, both in processing the scene and searching the premises as an incident to the arrest of Mr. Chapman, he owed a duty to the accused to protect the home and crime scene against intruders, either to secure the property by locking all avenues of ingress or to post a guard until the accused's lawyer or some responsible representative took over. The Sheriff's posting of a guard undoubtedly would facilitate a subsequent search, renewed or additional, with search warrant. No statute has been brought to my attention vesting law enforcement officials with the right to discontinue a search for the purposes of the performance of an autopsy on the victim and renewing the same thereafter. No statute sanctions the impoundment of a home in the interest of enforcement of the criminal law, without judicial sanction, for any time longer than is necessary to process the scene of a violent or unexplained death as commanded by the statute quoted herein.

The second search of the premises was made at about 12:30 P.M. without a search warrant, some eight hours after the conclusion of the first search incident to the accused's arrest. The State concedes that no consent was obtained for the same and that it was not a search incident to arrest

within the concept of substantial contemporaneousness with it. I have in mind that our Court has held a postponed search to be reasonable within constitutional concepts as in State v. Estabrook, supra, where the search is delayed from the place of arrest on the street to the police station when it is there carried out without undue delay.

Justification for the instant warrantless search would exist only if the circumstances within the knowledge of law enforcement agencies brought it within the so-called exigency rule. Except where the accused has tendered a valid waiver by consent, "[a] search is unreasonable unless authorized by a valid search warrant, is incident to a valid arrest, or is made in other exceptional circumstances which dispense with the need for a search warrant." Williams v. United States, 1959, 105 U.S. App.D.C. 41, 263 F.2d 487, 488; United States v. Jeffers, 342 U.S. 48, 72 S.Ct. 93, 96 L.Ed. 59; United States v. Rabinowitz, 339 U.S. 56, 70 S.Ct. 430, 94 L.Ed. 653; Johnson v. United States, 68 S.Ct. 367, 333 U.S. 10, 92 L.Ed. 436.

In United States v. Jeffers, supra, and in Miller v. United States, supra, the United States Supreme Court has suggested typical situations where exceptional or exigent circumstances would justify a warrantless search. The exigency rule was said to be applicable where, for example, the officers in good faith believe that violence will result or peril of bodily harm to themselves or to persons within the place to be searched may ensue if immediate action is not taken; also, where the officer is in pursuit of a fleeing felon; likewise, in situations where a movable vehicle is involved and delayed police entry or seizure would probably frustrate the confiscation of contraband or the gathering of the tools of crime; additionally, where there reasonably appears imminent destruction, removal or concealment of the property intended to be seized. Furthermore, the fact that the officers, as in the instant case, could have easily prevented any destruction or removal of the property

sought by the intended search through the mere expedient of guarding the door while a search warrant was obtained is practically conclusive of the absence of exigent or exceptional circumstances.

The State argued but offered no supportive evidence whatsoever before the presiding Justice substantiating in any degree exceptional or exigent circumstances. No witness testified to that effect. Even though the day was Veterans Day, a legal holiday, it is just mere surmise to conclude that no justice of the peace was available in the area for the issuance of a search warrant. The State has not shown that a search with warrant could not have been postponed to the following Monday without prejudice to the State. Townsley v. United States, 1965, D.C., Ct. of App., 215 A.2d 482.

The State contends that inability to specify the instruments for which the authorities intended to search created the necessary exceptional circumstances. Research has revealed not a single case where difficulties in meeting the specificity requirements of the Constitution and of the rules of court implementing the same respecting the article to be seized have been even suggested as establishing or tending to support the existence of exceptional or exigent circumstances. Certainly, there existed no impossibility of substantial compliance with the specificity demands of the Constitution. From the testimony before the presiding Justice, he could rationally conclude that in the initial search incident to the arrest of the accused, the authorities were looking for a bottle possibly stained with blood or to which human hair or tissue might have adhered as the weapon used in the perpetration of the crime. He ruled that describing the article searched for as "any instrument capable of being wielded as a weapon and containing stains of human blood, and/or hair, and/or tissue, would have provided adequate protection against any so-called fishing expedition." In this, he was only following precedent established by this Court in State

v. Brochu, 1967, Me., 237 A.2d 418, where a search warrant for "a container or *vile* [vial] containing methyl alcohol" was upheld.

A technical description of the thing to be searched for is not necessary and such reasonable designation will be constitutionally sufficient as will assure the constitutional safeguard against general exploratory invasions of privacy. This objective could have been met with ease in the instant case.

"It could not have been the intention of the framers of the constitution [or of our present rule] to require a designation of the thing to be searched for, so special and particular as to prevent the accomplishment of any beneficial purpose by a search-warrant." State v. Robinson, 1852, 33 Me. 564, 572–573.

The particularization suggested by the Justice below would meet the test applicable in determining the sufficiency of a search warrant, which is whether the warrant so meaningfully limits the objects to be seized that the executing officer is not thereby granted unlimited discretion. A warrant which described the articles to be seized as a bottle or instrument capable of being wielded as a weapon with human blood, tissue or hair adhering to it would fairly restrict and guide the searching officer and any search and seizure thereunder could not be viewed as the exploratory search condemned by the Constitution. Such a description would be reasonably definite enough in the circumstances. See, Commonwealth v. Owens, 1966, 350 Mass. 633, 216 N.E.2d 411. United States v. Clancy, 1960, 7th Cir., 276 F.2d 617.

The State finally rests its claim of legality of the search upon Stevens v. State, 1968, Alaska, 443 P.2d 600. But in that case the homicide took place in an isolated frontier village located on an island off the coast of southeastern Alaska. The first officer on the scene, the chief of police and law enforcement authority in this isolated bush village, was untrained in crime detection expertise. Under that State's

statutory law, the coroner or magistrate was under duty to go to the place where the dead person was found, or, in the alternative, to arrange for a peace officer to do so and report his findings to him. But no coroner or magistrate was available closer than Juneau on the mainland. The Alaska State police and the District Attorney were also from Juneau. The Court admitted that the chief of police had no alternative under the law but to lock the premises and make the necessary arrangements for the proper statutory authorities from Juneau to come and process the scene as required by law. In the instant case, the proper authorities under the statute, the Sheriff, the County Attorney and the medical examiner, were all at the scene within the hour, conducted a full investigation and search and discontinued the same prior to the entry in the case of the State police. That the law enforcement authorities failed to come up with the supposed implement used in the homicide during the statutory investigation of the scene in no way impugns full performance of their duties under the statutory command. As a matter of fact, the autopsy confirmed what the officers had reasonable cause to believe had taken place. We are not dealing in the instant case with untrained personnel, since the Sheriff of the County of Oxford is a well known public figure, and I take judicial notice of that fact, fully qualified in law enforcement and crime detection by reason of his extended past service with the State police.

The presiding Justice was fully justified from the evidence to believe that when the Sheriff's personnel and the County Attorney left the premises at about 4:30 A.M., the scene had been fully processed under the statute and their search of the premises incident to the arrest of Mr. Chapman had come to an end. The subsequent search in his view was an independent pursuit, subject to constitutional restraint, and his finding that it was unreasonable for lack of a search warrant was neither unwarranted nor an abuse of judicial discretion. Upon independent review, I reach a similar conclusion.

I find no quarrel however with the majority opinion in its conclusion that the reference bottle did not constitute legally abandoned property by the mere fact that it had been deposited in the trash barrel which at all times had remained within the possession and control of the owner.

Until the Legislature establishes a broader policy granting law enforcement authorities greater powers of impoundment respecting places where bodies of persons supposedly having come to their death by violence or other suspicious means may lie and authorizes holding action for investigatory purposes generally pending autopsies or other expert analyses involved in the investigation of crime, I do not subscribe to the theory that the judiciary should develop the same under the guise of interpreting the terms "unreasonable searches and seizures" of the Constitution. Reasonable investigatory searches of the homicide scene when mandatory under legislative enactment would be clothed with as much dignity and entitled to as much consideration by the judiciary as a search under a warrant issued by a Justice of the Peace. However, until the Legislature extends the scope of the present legislation, I must respectfully dissent.

I would deny the State's appeal.