David T. Gibbons, J.
In this prosecution of the indictment for the crime of murder, a combined pretrial hearing was had pursuant to CPL article 710, to (1) suppress certain physical evidence, and (2) to determine the admissibility on the trial hereof of certain statements allegedly made by the defendant, as measured by the guidelines of Miranda v. Arizona (384 U. S. 436) and as to voluntariness under the standards of Jackson v. Denno (378 U. S. 368), People v. Huntley (15 N Y 2d 72) and CPL 60.45.
The court makes the following findings of fact and conclusions of law.
I. ON-THTi-SGENE-INVESTIGATION AND INTERROGATIONS OP DEPENDANT
Upon receiving a report of a death at 83 Brookside Drive, Piándome, New York, the Clerk of the Incorporated Village of Piándome, performing the function of Police Dispatcher for the Piándome Police Department, dispatched Patrolman Bichard Collins to said address. He arrived at said dwelling house premises at about 9:31 a.m on May 12,1971, where he was given entry by David Lucas, a son of the decedent by a previous marriage. He inquired as to the whereabouts of the person to-be aided, and was then directed to an upstairs bed chamber where he discovered the body of Liliane Neulist, lying in bed with her head in a mass of blood.
After he ascertained that she had no pulse, he called the detectives of the Nassau County Police Department, and Dr. Bobert Neulist, the decedent’s husband and the defendant herein, at his dental office in Manhasset, at 9:42 a.m.
As a result of Patrolman Collins ’ notification to the Detective Division, Detectives Catapano and Schmitz arrived on the scene at 9:54 a.m. Detectives Wichmann and Hunter of the Homicide Squad arrived at about 10:40 a.m. to investigate what then appeared to be a suspicious death.
Dr. Beck and Dr. McCarthy of the Nassau County Medical Examiner’s office, arrived at about 11:25 a.m.
The defendant, Dr. Neulist, came to his home at 11:47 a.m.
After a preliminary on-the-scene examination, the Medical Examiners told th'e detectives present that death could have been caused by an aneurysm.
Soon after the defendant arrived, he was interrogated by Detective Wichmann.
*143 After Dr. Neulist gave a statement in writing (Exhibit 41), Detective Wichmann asked the doctor if he had any firearms in the house, and the doctor said no, in fact, he hadn’t fired a gun since 1954 when he was in the Navy. The defendant thereafter made the same statement to Detective Bonora, Chief of the Homicide Squad. After the body of the deceased had been removed, and the questioning .of the defendant had ended, the defendant departed and went to his mother’s home.
While Dr. Neulist was being interrogated, Detective Moeller of the Nassau County Police Department Scientific Investigation Bureau arrived at the scene at about 12:10 p.m, He examined the bedroom and the corpse, and observed certain items in a waste basket in that room. He took blood samples from a door in the bedroom and from a spot on the rug. He left the premises between 2:00 and 3:00 p.m., taking with him at that time, a pillow, pillow case, and the top sheet which covered the deceased. When he departed, a patrolman of the Piándome Police Department was left at the premises to stand guard and with orders to remain on the scene and not to permit anyone to enter the bedroom. This police surveillance continued until after 2:00 p.m., May 13,1971.
When Detectives Wichmann and Bonora arrived at police headquarters at Mineóla, ,at about 3:40 p.m. they learned that the Medical Examiner had found a bullet in the deceased’s head, and that they were dealing with a homicide.
Detective Bonora, at about 3:55 p.m., ordered that the respective members of the Neulist family, including the defendant, be brought to headquarters for further interrogation.
Soon after his arrival at headquarters, at 5:40 p.m., the defendant was again interrogated by Detective Wichmann and Detective Bonora.
When Detective Bonora concluded his questioning, he asked Dr. Neulist whether he would subject his hands to a paraffin test to determine if he recently discharged a firearm. Dr. Neulist consented to the test. The results of the paraffin tests on Dr. Neulist and David Lucas, who had also submitted to the tést, were both positive.
The doctor was asked by Detective Bonora to undergo a polygraph test. Detective Bonora tried for an hour to convince the defendant, but the latter said he had no faith in it, and refused to take the test.
Detective Bonorq later asked the doctor if Tie would submit his hands to a neutron activation test to determine the presence of gunshot residue. He told the doctor that since he said he *144 hadn’t fired a gun since he was in the Navy, this would establish the facts. Dr. Neulist consented and submitted to said neutron activation analysis.
The test involves the removal and collection of any residue from the hand or other objects sought to be tested for proximity to gunshot detonation, by swabbing them with a dilute solution of nitric acid, and subjecting the substance retained in such swabs to a scientific process of qualitative and quantative analysis to determine the presence of any barium and antimony ingredients of gunshot residue.
The decedent’s bedsheet, which had been removed from the house earlier, contained two bullet holes, which were also subjected to neutron activation analysis.
At approximately 9:10 p.m., Detective Wichmann asked the doctor if he had any objection to their performing a test on his shoes. The doctor said, “ No, not at all ”, and removed his shoes. The shoes were returned to Dr. Neulist at 9:25 p.m.
Detective Bonora, at about 9:30 p.m., asked Dr. Neulist if he would be willing to subject his clothing to scientific tests. Dr. Neulist consented. He took off his apparel for such purpose and attired himself in the clothing brought from home.
WTien the defendant was in the process of changing his attire and transferring his personal effects from one suit to the other, he was observed to have cast something into a nearby waste basket. The items were later removed by the police and found to be a piece of gauze and a button.
During the defendant’s interrogation conducted at Police Headquarters, Detectives Wichmann and Bonora obtained oral statements from the doctor which were reduced to writing but not signed by him.
At about 10:15 p.m., Mr. Skidmore, Dr. Neulist’s attorney, telephoned and advised that there be no more questioning until ■he arrived. Detective Wichmann then advised the doctor of his constitutional rights from a card which he had in his folder.
After Detective Wichmann had given the Miranda advices, he said, “ Do you feel that you still want to talk to me ”, to which the defendant replied, “No, I better not say anything until my attorney gets here. ’ ’
Prom the time the attorney telephoned, the police had no further conversation with the defendant until after his attorney arrived.
Mr. Skidmore arrived at police headquarters and proceeded to confer, in private, with his client. This continued from about 11 p.M. to about 2:30 or 3 a.m.
*145 During their conversations, Dr. Neulist told Mr. Skidmore about the statements taken at the house, and later at headquarters. After Mr. Skidmore asked to see the statements, Detective Bonora, Detective Wichmann, Mr. Skidmore and/Dr. Neulist went over the statements.
Dectective Bonora first read Exhibit 41, line by line, to Mr. Skidmore and Dr. Neulist, and he asked Dr. Neulist with respect to each sentence, whether it was true, and Dr. Neulist said, “yes”. Then Detective Bonora did the same thing with the continuation statement (Exhibit 42), which was not signed, and the doctor responded in the same vein, that it was correct.
At this point, Dr. Neulist, while in the presence of Detective Bonora, Detective Wichmann and his attorney, Mr. Skidmore, stated to the detective, “ I have co-operated with you fully today, but at the point where you accuse me of killing my wife, I refuse to answer any more questions ”. He followed this with, “ There will be no more questions ’ ’.
After the statements were so reviewed, Mr. Skidmore examined them. He said he had no objection to the doctor’s having signed the statement at the house, but he would not let him sign the second statement.
The defendant was not arrested, and he and his attorney left Police Headquarters at about 3:30 a.m., May 13, 1971. Reports in relation to the results of the neutron activation tests conducted on the defendant’s hands and effects came at a later date.
After reviewing all of the evidence herein, it is the determination of this court that at no time during the defendant’s contact with the police during his interrogation, both at his home and in Police Headquarters, was he ‘ ‘ taken into custody or otherwise deprived of his freedom of action in any significant way ’ ’ within the meaning of the rule laid down in Miranda v. Arizona (384 U. S. 436, 444, supra).
In People v. Yukl (25 N Y 2d 585, 589, cert. den. 400 U. S. 851), the Court of Appeals defined custody as it relates to police in-custody interrogation as follows: “In deciding whether a defendant was in custody prior to receiving his warnings, the subjective beliefs of the defendant are not to be the determinative factor. The test is not what the defendant thought, but rather what a reasonable man, innocent of any crime, would have thought had he been in the defendant’s position. (Hicks v. United States, 382 F. 2d 158; see, also, People v. Rodney P. [Anonymous], 21 N Y 2d 1; Williams v. United States, 381 F. 2d 20; Fuller v. United States, 407 F. 2d 1199; State v. Seefeldt, 51 N. J. 472; Conyers v. United States, 237 A. 2d 838 [D. C. Ct. of *146 App.]; State v. Bower, 73 Wash. 2d 634.) ” (See, also, People v. Pugliese, 26 N Y 2d 478 [1970].)
Upon application of this test of custody to the facts of the instant matter, the court finds that an innocent individual, finding himself in the situation of the defendant, would not consider himself detained, nor that his freedom of action was impaired in any significant way.
The defendant freely and willingly entered into these investigatory efforts by answering all questions and submitting to some of the tests requested by the police. The defendant commented upon his own co-operation up to that point, by saying, “ I have co-operated with-you fully today, but at the point when you accuse me of killing my wife, I refuse to answer any more questions ”.
The court also concludes that even if the defendant was found to be in police custody, which the court does not find, nevertheless, the issue of custody becomes academic inasmuch as the defendant, in the presence of his attorney, subsequently, while still in police headquarters, reaffirmed his prior co-operation and repeated each fact theretofore related by him to the police. (People v. Robles, 27 N Y 2d 155.)
The several statements given by the defendant to the police, both in the early part of the day in his home, and later at police headquarters, after the cause of death was determined, were the product of his own free volition.
Accordingly, the defendant’s motion to suppress the statements, aforesaid, is hereby denied, and the same may be used as evidence upon the trial hereof.
The defendant’s motion to suppress the results of the neutron activation tests of the defendant’s hands and of his shoes and clothing, and the small piece of gauze hereinabove mentioned, is also denied, and the same may be offered as evidence upon the trial hereof.
II. INITIAL, ON-THE-SCENE INVESTIGATION BY POLICE AND MEDICAL EXAMINEE,
The court will now concern itself with the legality of the removal by the police of various items of property from the Neulist house, as above set forth in Part I hereof, during the initial period of on-the-scene investigation by the police and the Medical Examiner before the actual cause of death had been ascertained.
As soon as David Lucas reported the discovery of his mother lying in a pool of blood in her bed ¡to the Police Dispatcher of the Village of Piándome, an emergency situation arose.
*147 Insofar as the police were concerned, the call was for help, and under such circumstances, it has repeatedly been held that it is the duty of the police to respond and investigate. (People v. Gallmon, 19 N Y 2d 389, cert. den. 290 U. S. 911.)
The law concerning emergency police action is also stated by Judge Warren E. Burger, now Chief Justice of the United States Supreme Court, in Wayne v. United States (318 F. 2d 205, 212 [1963], cert. den. 375 U. S. 860). (See, also, People v. Roberts, 47 Cal. 2d 374; David v. United States, 327 F. 2d 301; United States v. Lodahl, 264 F. Supp. 927.)
Part and parcel of the obligations cast upon the police under the circumstances of this emergency situation was notification of the Medical Examiner of Nassau County under the law, and the commencement of the investigation by the Medical Examiner to determine the cause of death.
Authority for this procedure is found in section 2101 (subds. 2, 3, and 4) of the County Government Law of Nassau County (L. 1936, ch. 879, as amd.).
Essentially, Patrolman Collins’ arrival at the Neulist house was for a lawful purpose. It was his alarm which brought forth other police personnel, as well as the Medical Examiner.
When it had been ascertained that Mrs. Neulist was dead, in view of the condition of the body, it became the obligation of the Medical Examiner to determine the cause of death. In this effort, it was proper for him to avail himself of the assistance of the police.
Under the provisions of the County Government Law of Nassau County, there was a duty cast upon the Medical Examiner to “ take possession of any money or other property which may be found upon the body and deliver the same to the property cleric of the Nassau County department of police, to be retained until such time as the commissioner of police shall deem such money or other property no longer useful in establishing the cause of death or in solving a crime ”.
It is the determination of the court that such initial investigation was for the specific purpose of giving aid on the part of the police, and for the purpose of ascertaining the cause of death on the part of the Medical Examiner.
It is the finding of this court that these agencies of the government were then lawfully in the premises, and that the acts of the police, to the extent of taking photographs, and removing the bedsheet, pillow and pillow case, and taking blood samples from the floor covering and the woodwork, were done for and on *148 behalf of, the Medical Examiner, and for the purpose of aiding him in determining the cause of death.
The real cause of death was determined shortly after 3 p.m., and the purpose of the initial visit by the Medical Examiner and the police was then ended.
Accordingly, the defendant’s motion to suppress said items of property is hereby denied in all respects.
III. RETURN TO PREMISES BT POLICE TO SEARCH AFTER CAUSE OF DEATH DETERMINED
While at his home, shortly after 3 p.m., Detective Karazia received a telephone call from Detective Sergeant Lannon, who told him that the decedent’s death was the result of a gunshot. He told him to go to the Neulist house to take more pictures and to conduct a search for a gun. Pictures had been taken by Scientific Investigation Bureau photographers when the police made their initial appearance on the scene in the morning.
He proceeded directly to the Neulist house from his home, and upon his arrival at 3:35 p.m., he found neither the defendant nor any other members of the family present. Patrolman Donadío of the Plandone Police Department was then at the premises. After taking some pictures, Detective Karazia began to search the house with the aid of Patrolman Donadío. Detective Karazia was the ranking police officer on the scene. During his search, he was assisted in this effort by 10 other police officers, While this searching effort was in progress, Sergeant Moeller, who had been on the premises earlier in the day, and Patrolman Jedder of the police Scientific Investigation Bureau, after taking more photographs of all the rooms in the building and its exterior, searched the bedroom. In the words of Detective Sergeant Moeller, who returned to the Neulist house in the afternoon, “they were looking for things of interest”. He took the rest of the bed clothes, which included a bedsheet, a pillow and pillow case, two blankets and a bedspread from the house. While searching in the attic, he also found a box containing a gun holster and miscellaneous .38 caliber ammunition, which he also removed to police headquarters.
Detective Moeller said that he was attracted to the contents of the wastepaper basket earlier in the day on his first visit to the premises, and later called it to the attention of Detective Karazia, because “there were some vials or a hypodermic needle or something like that in there, and I just suggested, why did we take it back? It is very hard to explain something like that, because you don’t know what you are looking for. You are *149 looking for whatever happens to turn up. You don’t know whether it is going to fit in afterwards ”.
While in the process of searching the bedroom, Detective Karazia emptied, upon the floor, the contents of the waste basket which Detective Sergeant Moeller had earlier observed and brought to Detective Karazia’s attention. He removed them to headquarters. These items included 2 ampules, 1 cc. size, bearing a notation, “ cebolin ”, l-10cc. vial of neoealducon; 1 top of a vial or ampule; 1 syringe with needle and protective sleeve; 1 piece of red tubing; a disposable paper bag labeled “plastipak ”; and á piece of paper labeled “ sterile disposable yale ”. He also found and removed a lOcc. vial bearing the name of “ cynobalanin ”, which was described as Vitamin B-12, from the refrigerator. Detective Karazia described this aspect of the search in the following manner: “ I poured them out on the floor ”, and “ I selected what I was to take ”. When questioned in relation to a disposable paper bag, he stated that he took it because “ I felt a connection between the syringe and the needle
During the search, .some handwritten notes were found by Police Chief Jahnsen of the Piándome Village Police Department, in a closet under some linens and towels in the maid’s room, which was occupied by Richard Lucas, and some were found in a drawer, and on the bed in the same room. The Police Chief had been specifically directed to search this area for the particular items found.
After additional pictures were taken by the photographer of the police Identification Bureau, and his search completed, Detective Karazia left the Neulist residence with Detectives Madonia, Gomez and Golden, at about 10:30 p.m., leaving a policeman posted outside, after which he stationed himself at a point in the vicinity of the post office in Port Washington to await further orders.
Detective Karazia stated that he, at no time, asked anybody for permission to search the house.
In their efforts to find a gun, the police returned to the Neulist premises at 83 Brookside Drive, Piándome, on May 13,1971, and searched for such weapon with a mine detector. It may be noted that, although four search warrants (considered in Part IV of this decision) had been obtained on the prior day to search for this weapon, no search warrant was ever obtained to seaich the Neulist residence.
The court now brings into focus the legality of the removal of certain articles by the police as a result of the search of the *150 Neulist house conducted under the supervision of Detective Karazia, which began with his arrival at the scene at about 3:35 p.m., after it had been learned by the police that the death was a homicide due to a gunshot wound in the decedent’s head.
Unreasonable searching and seizure by the police is proscribed under the mandate of the Fourth Amendment of the Constitution of the United States, except where the same is authorized by the warrant of a court, issued upon probable cause -and particularly describing the place to be searched, and the persons or things to be seized. By a line of decisions of the courts, there has been infused into the operational orbit of this amendment, the several situations when the police may act.
Accordingly, the police are authorized tp conduct a search and seizure only under the following circumstances: (1) by authority of a search warrant; (2) by consent of the individual who has an interest in the place and the property which is the subject of such search and seizure; or (3) where the search is made contemporaneously with a legal arrest. (People v. Loria, 10 N Y 2d 368, 373.)
In addition, a seizure may be made by the police officer where he inadvertently observes contraband in open view at a time when he is legally in the place from which he makes the observation. (Coolidge v. New Hampshire, 403 U. S. 443 [1971].)
And, lastly, the police are empowered to search and seize property within the legal bounds of the Constitution when, because of an emergency situation, the exigency of the conditions confronting the police demands such action for the protection of life or property, as described in the authorities set forth in Part II hereof.
To pass constitutional muster, the search and seizure by the police on their return visit, must fall into one of the foregoing classes.
As justification for the later entry by the police into the Neulist house to search the same, the District Attorney advances the contention that exigent conditions existed because of the gravity of the crime involved (murder), and that greater latitude in both timé, space, and degree should be allowed the police to conduct a general “ on-the-scene ” search of an individual’s home without the constitutional necessity of probable cause and the issuance of a warrant for that purpose.
In ■support of this claim that the authority of the police carries over to the later entry, the District Attorney points to several reasons based on expedience why this should be so.
*151 First, he claims that the second search was necessary to ferret out the murderer who may still be hiding in the house. This argument is asserted notwithstanding that apart from the two members of the Medical Examiner’s staff, there were a larger number of police in the premises earlier in the day, including both county and village police. Furthermore, the dimensions of some of the areas searched (in waste basket, under linens and towels, and in drawers), and the nature of the items seized, Clearly indicate that the search was not for a murderer, and that the seized articles were not inadvertently discovered while in the lawful search for a hidden culprit. '
Next, it is asserted that since the identity of the killer was unknown to the police, it would not be possible to prepare an affidavit which would support the granting of a search warrant.
And overriding these points, it is the further contention that once having legally entered upon the crime scene, this right extends to, and carries over to, a later time when the police presence is retained by posting a police guard at the scene.
While urging that the so-called “ crime scene search ” by the police should fall into that special class of cases allowing searches under emergency or exigent conditions, the District Attorney said, “ There is an absence of a body of law on this question. I would suggest in that case, where there is something unusual and where there is something that no court of either persuasive jurisdiction or compelling jurisdiction has spoken to before, that this court must return to the mandate of the Fourth Amendment itself.”
The determination of this aspect of the motion is made with an awareness that, where the People contend that the warrantless search was made because of the exigency of the prevailing circumstances,' the burden of establishing such right is upon the People.
In McDonald v. United States (335 U. S. 451, 456 [1948]), the court said: “We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exception from the constitutional mandate that the exigencies of the situation made that course imperative.” (Emphasis supplied.) (United States v. Jeffers, 342 U. S. 48 [1951].)
After a careful analysis of the facts and an extended research of the law, the court concludes that the People have not established their claim that the second search supervised by Detective Karazia was justified by exigent circumstances. (Coolidge v. New Hampshire, 403 U. S. 443, 454-455, supra.)
*152 In its inquiry into the law, the court has come upon the decision in Dombrowski v. Cady, decided on June 2, 1972, by the United States Court of Appeals for the Seventh Circuit (11 C. L. R. 2289) which is particularly applicable to the question now under consideration.
In Dombrowski, the denial of a writ of habeas corpus by a defendant serving a life term for the crime of murder, was reversed under the following circumstances.
In response to information emanating from the defendant that a body could be found on his brother’s farm, the police conducted a five-hour warrantless search of the farm. As a result of the search, a dead body was found in a nearby dump area, about three blocks from where the defendant had parked his Dodge automoblie. While the search was in progress, an officer peered into the car and saw the backseat covered with blood and a bloodstained briefcase. At this time, a white sock lying in open view, near £he body, was taken by the police.
A search warrant was obtained to search the car, and the car seat and the briefcase were then seized under its authority.
On the following day, a crime laboratory specialist returned to the scene and again searched the Dodge. On this occasion, he took up a piece of bloody floor mat and a second bloody sock.
In holding that the report of a dead body established a situation of exigency which justified the entry upon the farm, the court said (supra, p. 2290): “ We hold that entry of the farm without warrant was laAvful and the search of the farm for the body was reasonable. The lawful farm search produced the body. Neither do we see an unreasonable widening of the legal search in seizing the white sock in plain view nearby.”
To this may be added, that when the police are engaged in a search prompted by the exigent circumstances of seeking a body, they may seize any object which may be “ upon ” or “ near ” the body in open view, which may relate to the death, as was properly done with respect to the blood stains, pillow, pillow case, and bed .sheet in the instant case, upon their initial visit to the premises.
It is the intent of the law, that when an emergency or exigent circumstance exists (such as a report of a human death), the entry by the police on private premises shall be legal for the purpose of investigating and giving aid in relation to the call.
In Dombrowski, when, after the initial entry upon the farm, the body was found in a condition suggesting homicide, the investigation purpose of the entry had been completed, and a second stage involving detection and apprehension of the crim *153 inal began. For this purpose, a search warrant was obtained to enter the Dodge located on the farm and seize the bloody back ear seat and briefcase, which had been “ inadvertently observed ” by the police during the first entry.
The piece of floor mat and the bloody sock removed by the police on the day following the execution of the search warrant were deemed to be the subject of an unconstitutional search and seizure by the court which then rejected the concept of a “ continuing authority under the warrant ’ ’. The court further declared that they .should be Suppressed because, ‘ ‘ these items were not described in the warrant ”.
In the case at bar, the first entry into the Neulist house by the police was legally made for the purpose of giving aid and investigating the report of a death. These circumstances constitute, as a matter of law, such an emergency situation as would warrant their entry for such reason. Immediately upon the policeman’s observation of the condition of the body, he brought into operation the facilities of the Medical Examiner’s office, which were directed at a determination of the cause of death. At this stage of the matter, it was thought that death was due to an aneurysm, and all of the efforts on the part of the physicians from the Medical Examiner’s office were thereafter aimed at ascertaining the precise reason for the death. The purpose of this aspect of the investigation ended when, after further tests, the cause of death was attributed to a homicide by gunshot.
The purpose of the first entry into the Neulist house under the aforesaid exigent circumstances had been accomplished after the body had been removed, with the articles of property “upon” or “near” the same, and the cause of death ascertained by the Medical Examiner.
With this disclosure, a new area of inquiry developed which involved the detection and apprehension of the murderer for criminal prosecution.
This court, as the court in Dombroivski {supra), does not subscribe to the validity of any claim which would justify a return entry and search upon the theory of continued “ on-the-scene ” search. The posting of a policeman under such circumstances is for the purpose of maintaining the crime scene in an undisturbed state and to prevent a criminal removal of evidence, during the time required to obtain a search warrant.
In the instant case, the police did, in fact, apply for four search warrants after the cause of death was found to be the result of homicide. By these warrants they were authorized to *154 seek a gun in the home of the defendant’s mother, in his two. dental offices, and in his 'motor vehicle. This was the legally correct procedure to he followed under the circumstances. Why they did not seek a similar search warrant for the defendant’s residence is not explained in the record. Of course, the fact that these four search warrants were obtained, leaves very little force to the People’s argument that they were not in a position to submit to the court an affidavit containing facts which would result in a search warrant to seek the murder weapon in the Neulist house. It is not to be construed that this court holds that the obtaining of a search warrant to search the Neulist residence for the murder weapon would have precluded the police from including in the application for said search warrants, such facts then at their disposal as may have persuaded a Judge to include in the same warrant the other items which the police sought to search for and seize. Nor does the court hold that the police may not have obtained further or additional search warrants based upon spch information which they may have legally obtained in the course of executing the first search warrant.
The failure to obtain such search warrant or warrants, leaves us'vith a second police entry into the Neulist premises for an illegal general exploratory-search under the direction of Detective Karazia. A search which Detective Moeller characterized as one where “ You don’t know what you are looking for. You are looking for whatever happens to turn up. You don’t know whether it is going to fit in afterwards ”, and of which, Detective Sergeant Moeller also said, ‘ they were looking for things of interest ”.
At this point, it should also be noted that when Detective Karazia emptied the contents of the bedroom waste basket upon the floor, he was in the process of searching fór a hypodermic needle which had earlier, during the initial entry, been observed by Detective Moeller. This item, was not the subject matter of a seizure of that which is in plain view. Here, the object seized was not inadvertently come upon by Detective Karazia. It was earlier called to his attention by Detective Moeller and he was looking for it.
The illegality of this seizure is pointed out in Doubrowski v. Cady (11 C. L. R. 2289, 2290, supra), in the following language: “ The plain view doctrine applies only where the discovery was ‘ advertent. * * * But where the discovery is anticipated, where the police know in advance the location of the evidence and *155 intend to .seize it, the situation is altogether different.’ 'Coolidge at 469-470.”
For the reasons hereinabove set forth, the articles taken by the police as a result of their .search .of the Neulist premises' during their second entry after the cause of death had been determined, must, and are hereby suppressed from use as evidence upon the trial herein. They represent the fruits of an unconstitutional intrusion into the defendant’s home for the purpose of conducting an exploratory search, calculated to seek out whatever may, by chance, be useful in an impending criminal prosecution.
The foregoing determination is made with an awareness of State v. Chapman (250 A. 2d 203), decided by the Supreme Judicial Court of the State of Maine in 1969, and which was encountered by the court in the course of its research herein.
Essentially, the majority in Chapman found justification on the “ crime scene ” theory for repeated later entries into a defendant’s home for searching purposes, and the warrantless seizing of evidence after an initial entry had been made under exigent circumstances to investigate a report of a death,
The opinion of the majority rests upon the supposition that exigent circumstances derive from the gravity of the crime of murder and the public interest involved in the detection and apprehension of the perpetrator, coupled with a projection of the legality of the initial entry by a continuing police surveillance of the crime scene, and reliance upon the rule of Terry v. Ohio (392 U. S. 1 [1968]), where, in the interest of crime prevention and the protection of law enforcement personnel, a “ stop and frisk ” was permitted without probable cause, as a legitimate police investigative technique.
This court does not subscribe to the reasoning of the majority in State v. Chapman (supra).
First, it shoqld be observed that murder is indeed a heinous crime which calls for the strongest measures to be used in detecting and punishing the offender. However, the gravity of a crime is not the criteria for a warrantless search under the exception of the exigent circumstances rules, and, in any event, the processes of law enforcement must at all times conform to constitutional standards and not seek shortcuts which inevitably result in the legal spoilage of otherwise important evidence. This is particularly well expressed in Miller v. United States (357 U. S. 301, 313, supra [1958]), where the court said: “We are duly mindful of the reliance that society must place for achieving law and order upon the enforcing agencies of the criminal law. *156 But insistence on observance by law officers of traditional fair procedural requirements is, from the long point of view, best calculated to contribute to that end. However much in a particular case insistence upon such rules may appear as a technicality that inures to the benefit of a guilty person, the history of the criminal law proves that tolerance of shortcut methods in law enforcement impairs its enduring effectiveness.”
This court is also of the view that the reasoning of the majority in Chapman is based upon a tortured stretching of the “ stop and frisk ” principle of Terry v. Ohio (392 U. S. 1, supra), and an attempt to apply it in an area never contemplated by the Supreme Court of the United States.
In addition, it should also be noted that neither this court, nor the court in State v. Chapman (supra, p. 207) can find any authority to support “the right of police officials to conduct an investigation on the permises where an apparently violent death has occurred and a homicide or other serious crime may have been committed, and to which premises the police have gained lawful entry without warrant. ’ ’
Lastly, the majority rule enunciation in Chapman has no application under the present posture of the Fourth Amendment of the Constitution of the United States as expressed in Chimel v. California (395 U. S. 752), decided on June 23, 1969. The rationale of Chapman was rooted in the legal philosophy declared in United States v. Rabinowitz (339 U. S. 56 [1950]). This deficiency in Chapman was pointed out in State v. Brothers (478 P. 2d 442, 444, 445), decided by the Court of Appeals of Oregon on December 23, 1970, wherein the court held: “ In June of 1969, the Supreme Court overruled Rabinowits in Chimel v. California, 395 U. S. 752, 89 S. Ct. 2034, 23 L. Ed. 2d 685 (1969), and restored the primacy of the Fourth Amendment’s warrant clause * * * The Chapman case rests upon the rule for search and seizure laid down in Rabinowits. State v. Chapman, supra, at 205. As previously pointed out, this rule is no longer the law.”
State v. Chapman (250 A. 2d 203, supra) rests on unsteady footing by reason of another subsequent United States Supreme Court case. This court makes the observation that, although distinguishable from the instant case, where there was no finding by this court of a search in progress while Dr. Neulist was involuntarily detained, or in custody, inasmuch as the defendant, Chapman, was in custody, the thinking of the court in the Chapman case may have been, of necessity, influenced to come to a different result by virtue of the holding in Davis v. Mississippi *157 (394 U. S. 721), which was decided after Chapman, on April 22, 1969.
IV. THE SEARCH UNDER THE SEARCH WARRANT
At about 11:55 p.m., Detective Bonora delivered four search warrants to Detective Karazia. They were signed by Judge Paul J. Kelly, of this court, and they authorized a search for a “.22 firearm (pistol or rifle) ”, between May 12 and May 13, 1971.
These four search warrants were based upon a supporting affidavit by Detective Wichmann containing allegations tending to show the existence of probable cause to believe that the defendant was in illegal possession of a firearm under section 265.05 of the Penal Law. In this connection, Detective Wichmann stated that Detective Bonora, as his informant, told him that the latter had a conversation with David Lucas, in which David Lucas “ told him that Robert Neulist informed David that he, Robert, had a gun and not to worry about burglars ”. In addition, Detective Wichmann also stated that at about 1:30 p.m., before it was determined that the death of Liliane Neulist was other than by natural causes, asked Robert if there were any firearms or pistols in the house, and he answered “ No.”
In addition, the affidavit contained allegations by Detective Wichmann to the effect that he was informed by the decedent’s children, David and Mimi Lucas, that the decedent told them that she had been beaten by the defendant. Detective Wichmann also alleged that David Lucas told him that when the defendant left his home at about 8 a.m. on May 12,1971, to take the children to school on his way to the office, he was ‘ carrying a small bag from home ”.
When these search warrants were delivered to Detective Karazia for execution, Detective Bonora told him to look for ‘ ‘ a gun in the bag in the car. ’ ’
Detective Karazia testified that he read the warrant and that it authorized him to look or search for “ a gun * * * that’s it.”
The respective warrants provided that searches for the described weapon take place at the following places: (1) at 30 Main Street, Port Washington, the defendant’s dental office; (2) at 2035 Lakeville Road, the defendant’s second dental office; (3) at 17 Mackey Avenue, Port Washington, home of the defendant’s mother, and (4) in a 1970 Chevrolet convertible, red, Registration No. 68790L, 1971, located at 17 Mackey Avenue, Port Washington.
*158 Defendant’s application to suppress challenges the legality of the foregoing search warrants and the propriety of their execution.
Detective Karazia proceeded to execute the same by searching the respective places described therein. He found, and removed nothing, from the two designated dental offices of the defendant* nor from his mother’s home at 17 Mackey Avenue, Port Washington, New York.
At the latter address he found the 1970 Chevrolet convertible bearing New York Registration No. 68790L, described in the search warrant authorizing a search of said motor vehicle, and at about 1:17 a.m., May 13, 1971 he discovered a brown leather bag therein.
In his quest to find the weapon described in the warrant, he opened the bag and at once observed that it did not contain any firearm. However, he did see that the bag contained some 27 items of “ dental and anaesthetic equipment ”, one of the said items being a hypodermic needle with a blue plastic base.
In his return, Detective Karazia listed the brown leather bag and all of the 27 items found in the bag.
All of these items were eventually returned to the defendant with the exception of the brown leather bag, and the hypodermic needle.
The motor vehicle was eventually brought to police headquarters at Mineóla. It was observed being towed in after midnight by Mr. Skidmore, the defendant’s attorney.
It was shown at this hearing that the steering wheel of the car was thereafter swabbed as the initial step for neutron activation analysis, and then subjected to such testing process.
No reference to the seizure of this motor vehicle is made in Detective Karazia’s return on the search warrant above mentioned.
The question presented for "consideration is one touching upon the propriety of the execution of these search warrants by Detective Karazia, and the removal of the motor vehicle to police headquarters.
In the clearest language, the search warrant directed a search of the Chevrolet, and it clearly specified that the vehicle was to be searched for a “.22 firearm (pistol or rifle) ”.
At the outset it may be stated -that the entire car was the subject of a search for this weapon, and this would include looking into any receptacle, bag or container situated in the car.
With respect to what limitations exist upon the authority granted to the police under a search warrant, we have no further *159 to look than the words of the Fourth Amendment of the Constitution of the United States.
It is there provided as follows: “ The right of the people to be secure in their persons, houses, papers and effects, against unreasonable searches and seizures, shall not he violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.** (Emphasis added.)
This has been construed by the Supreme Court of the United States in Marron v. United States (275 U. S. 192, 196 [1927]), as follows: “ The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to \the discretion of the officer executing the warrant.” (Emphasis added.)
A search made by virtue of a search warrant is thus circumscribed by the specificity of the place to be searched and the subject matter sought to be found. Any search or seizure of that which is not described in the search warrant constitutes a general or warrantless search. The Supreme Court has, on several occasions, reiterated its strong stance against such activity. (Stanford v. Texas, 379 U. S. 476 [1965]; Berger v. New York, 388 U. S. 41 [1967].)
The People take the position that, because the brown leather bag was already known to the police and was mentioned in Detective Wiehmann’s affidavit in support of the search warrant, it was “ not a stranger to the warrant ”, and it should, therefore, be construed that authority to seize the bag originated merely because of such recital
The established rule of law is, as set forth in Marron v. United States (supra, p. 196), that in the execution of a search warrant, the police officer’s authority flows only from the warrant and nothing else, and that “ as to what is to be taken, nothing is left to the discretion of the officer executing the warrant.”
He could not assume the role of the court, by examining the papers upon which the search warrant was granted, to extend his own authority with respect to articles not listed in the warrant; and, as stated in Dombrowski v. Cady (11 C. L. R. 2289, supra), after the initial purpose of the search warrant has been fulfilled by search, the place designated for the articles listed in the warrant, ‘ ‘ There was no continuing authority under the war *160 rant “ to seize other items situated in the same place which may be related to the case.
The People also advance the claim that the seizure of the bag, and its contents of 27 articles of dental equipment, including a hypodermic needle, was justified because the detective recognized their “ evidentiary value ”. Here, again, it must be said that it is not for the detective, searching under a warrant, to pick and choose what he shall retain after seizing a multitude of unlisted items, To permit this would be to clothe him with the power of the court, in direct contravention of the admonition contained in McDonald v. United States (335 U. S. 451, 455-456 supra), (and cited with approval in Chimel v. California [395 U. S. 752, 761 supra]), as follows: “ We are not dealing with formalities. The presence of a search warrant serves a high function. Absent some grave emergency, the Fourth Amendment has interposed a magistrate between the citizen and the police. This was done not to shield criminals nor to make the home a safe haven for illegal activities. It was done so that an objective mind might weigh the need to invade that privacy in order to enforce the law. The right of privacy was deemed too precious to entrust to the discretion of those whose job is the detection of crime and the arrest of criminals * * * And so the Constitution requires a magistrate to pass on the desires of the police before they violate the privacy of the home. We cannot be true to that constitutional requirement and excuse the absence of a search warrant without a showing by those who seek exemption from the constitutiohal mandate that the exigencies of the situation made that course imperative.”
The authority afforded by a search warrant to search a motor vehicle for a weapon, does not by implication, allow for a seizure of the vehicle, particularly after it has already been ascertained that the weapon is not in the vehicle.
On the argument of this motion, the District Attorney conceded that the omission of the bag from the search warrant was due to error. With a full awareness, by the police, of the existence of the bag, and its whereabouts, it should have been included, in the search warrant. This omission, as above demonstrated, was cause to suppress the bag.
By the same token, with an awareness by the police that the death was due to gunshot, and that the vehicle or the steering wheel would be subjected to neutron activation analysis by the police to determine if it was held by a hand which had recently fired a gun, this item should also have been included in the search warrant.
*161 The authority flowing from a search warrant may not be extended by the searching officer to include other items of personal property, discovered in the course of executing a search warrant, or afterwards, which may relate to the case. (Dombrowski v. Cady, 11 C. L. R. 2289, supra.)
The defendant’s constitutional rights against unreasonable search and seizure under the Fourth Amendment demand that the burden be on the State to submit all of the evidence it seeks to include in the warrant, to the scrutiny of the court to which it applies for such warrant. It cannot complain if the warrant was issued by the court in accordance with its own request and is deficient in neglecting to list certain other items.
A seizure of that which is not embraced and specifically described in a search warrant, even if relevant to the case, receives no vitality from the warrant. An article of personal property seized under such circumstances is the fruit of a general search and must, therefore, be suppressed. (Marron v. United States, supra.)
Any evidence touching upon the neutron activation analysis of the substance taken from the steering wheel of the said Chevrolet motor vehicle, is likewise hereby suppressed. Since the vehicle was taken by the police in violation of the defendant’s constitutional rights, such evidence is acquired by exploitation of the primary illegality, and is, therefore, tainted as the fruit of the poisoned tree, and as such may,- therefore, not be used in evidence in this prosecution. (Wong Sun v. United States, 371 U. S. 471; Silverthorne Lbr. Co. v. United States, 251 U. S. 385; Nardone v. United States, 308 U. S. 338; People v. Rodriquez, 11 N Y 2d 279.)
For the reasons hereinabove set forth, the defendant’s motion to suppress the said brown leather bag, the hypodermic needle, and the steering wheel of the aforesaid motor vehicle, and any evidence in relation to neutron activation tests made with respect to any residue removed from the said articles, is hereby granted, and the same may not be used as evidence upon the trial herein.
V. THE MONITORED TELEPHONE CONVERSATIONS BETWEEN EUGENE LUCAS AND THE DEPENDANT
Eugene Lucas was the former husband of the deceased, and the father of David Lucas, who discovered the body of his mother on May 12,1971, and made the call to the police.
Eugene Lucas gave a statement to the police on May 13, 1971, to the effect that he had prior conversations in which the defendant made certain statements which he thought important as damaging remarks.
*162 On May 14, 1971, Eugene Lucas called a detective and suggested that his telephone be monitored so that he could get the defendant to repeat over the telephone and corroborate what the defendant had previously said to Lucas at a prior meeting.
Eugene Lucas sensed that his son was a suspect, and it is the determination of this court that the motivation for his request to have his phones monitored was to obtain evidence from the defendant which would tend to remove the suspicion from his son.
In furtherance of this purpose, he arranged to have the police install a monitoring device on his office phone in New York City on May 17, 1971. He then called the defendant’s dental office and told the nurse that it was urgent for the defendant to return his call. The defendant shortly thereafter returned the call. The conversation was recorded on a tape which is Exhibit 47 in evidence. The transcript of these conversations is contained in Exhibit 45 in evidence.
In a similar manner, a monitoring device was attached to his residence phone at Greenwich, Connecticut, on May 18, 1971. The witness then called the defendant’s home at about 6:30 p.m. He first spoke to the defendant’s son. The defendant returned the call within a few minutes. These conversations were recorded on a tape, which was received in evidence as Exhibit 48. A transcript of the conversations is contained in Exhibit 46 in evidence.
The defendant’s motion to suppress the respective recording tapes (Exhibits 47 and 48) and the written transcripts thereof (Exhibits 45 and 46) is without merit. There were no violations of the defendant’s constitutional rights under the Fourth Amendment.
The recordings of the telephonic conversations had herein are not embraced within the proscription against eavesdropping or wiretapping as set forth in subdivision 1 of section 250.00 of the revised Penal Law (eff. Sept. 1, 1967), which provides as follows: “ 1. ‘ Wiretapping ’ means the intentional overhearing or recording of a telephonic or telegraphic communication by a person other than a sender or receiver thereof, without the consent of either the sender or receiver, by means of any instrument, device or equipment.” (Emphasis added.)
The same definition of “ eavesdropping ” as meaning “ wiretapping ” and the “mechanical overhearing of conversation” was carried into subdivision 1 of CPL 700.05 (eff. Sept. 1,1971).
It is manifest that this law is directed against a nonconsensual intrusion upon the telephonic conversations of individuals, as *163 expressed in Katz v. United States (389 U. S. 347 [1967]). It is, however, no violation of this law when one party to the conversation consents to, or arranges, a recording of the same by monitoring his own telephone instrument. (United States v. White, 401 U. S. 745 [1970]; On Lee v. United States, 343 U. S.-747 [1952]; United States v. Kaufer, 406 F. 2d 550 [1969] ; and People v. Gibson, 23 N Y 2d 618.)
For the reasons hereinabove set forth, it is the determination of this court that the defendant’s motion to suppress the said tape recordings (Exhibits 47 and 48) and the transcripts thereof (Exhibits 45 and 46) is hereby denied, in all respects, and the same may be used in evidence upon the trial herein.
To summarize, the court hereby suppresses all items, photographs taken, and evidence seized or obtained after 3 p.m., upon the second visit by the police to the premises at 83 Brookside Drive, as referred to in Part III of this decision, as well as all items seized, or obtained pursuant to the search warrants, as referred to in Part IV of this decision, and the 1970 Chevrolet automobile, and its steering wheel, and any scientific tests and reports made or conducted with respect to the said items suppressed.